UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 383 |
| v. | ) | |
| | ) | Judge Sharon Johnson Coleman |
| MARGARITO FLORES | ) | |

**GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE**

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR.,
United States Attorney for the Northern District of Illinois, hereby respectfully
submits its response in opposition to Defendant's Motion for Compassionate Release.
Flores's motion should be denied because this Court lacks authority to order Flores
released on home confinement or grant Flores's motion for compassionate release
before he fully exhausts administrative remedies within the Bureau of Prisons, and
because defendant has failed to make the necessary showing of extraordinary and
compelling reasons warranting a sentence reduction.

**INTRODUCTION**

Defendant Margarito Flores is a convicted drug trafficker who operated at the
highest levels of the drug trafficking world. Between May 2005 and December 2008,
defendant and his twin brother and co-defendant, Pedro Flores, operated a Chicago-
based distribution cell for the Sinaloa Cartel and the Beltran Leyva Organization
("BLO"). On average, this cell received 1,500-2,000 kilograms of cocaine per month,
half of which was distributed to the Flores brothers' Chicago-area customers. The

1

other half was distributed to customers throughout the United States, including in Columbus, Cincinnati, Philadelphia, New York, Washington, D.C., Detroit, and Vancouver. The Flores brothers negotiated directly with Sinaloa Cartel and BLO leaders and principle lieutenants to obtain large shipments of cocaine and heroin, transported by the cartels from Colombia through Mexico and eventually into the United States, on credit.

Once inside the United States, the drugs were transported to the Chicago area using a system of stash houses, warehouses, and vehicles with hidden trap compartments. The Flores brothers directed a team of Chicago-based workers who: (1) offloaded drug shipments; (2) stored drugs at various stash houses and warehouses; (3) distributed the drugs to customers; and (4) collected and packaged drug proceeds. The drug proceeds were then transported back to Mexico, through the cartels' infrastructures, where the Flores brothers and their sources of supply received the proceeds.

In 2008, the Flores brothers broke away from their positions within the cartel world and began cooperating with the government. Both brothers' cooperation has been extensive, and was done at great personal risk to themselves and their families. As a result, the defendants have been in protective custody since their self-surrender to the U.S. Marshals in 2008.

In August 2012, defendant pled guilty to the Third Superseding Indictment, which charged defendant and his brother with conspiring with others, including Sinaloa Cartel leaders Joaquin Guzman Loera (aka "Chapo") and Ismael Zambada

Garcia (aka "El Mayo"), Guzman Loera's son, Jesus Alfredo Guzman Salazar ("Alfredillo"), Zambada Garcia's son, Vincente Zambada Niebla, and others to distribute thousands of kilograms of cocaine and heroin, in violation of Title 21, United States Code, Section 846. R. 350. On January 27, 2015, defendant was sentenced by Chief Judge Ruben Castillo to 14 years' imprisonment. He is currently serving his sentence.

## BACKGROUND

### *Offense Conduct*

Between May 2005 and 2008, the Flores brothers conspired with conspired with Joaquin Guzman Loera ("Chapo"), Ismael Zambada Garcia ("El Mayo"), Vicente Zambada Niebla, Jesus Alfredo Guzman Salazar, Juan Guzman Rocha, German Olivares, Felipe Cabrera Sarabia, Alfredo Vasquez Hernandez, Tomas Arevalo Renteria, and others to distribute, and to import into the United States, thousands of kilograms of cocaine and multi-kilogram quantities of heroin.

More specifically, the Flores brothers operated a wholesale cocaine and heroin distribution organization that distributed thousands of imported kilograms of cocaine and multi-kilogram quantities of heroin in Chicago, and throughout the United States. The Flores brothers obtained substantial quantities of cocaine and heroin from the Sinaloa Cartel, as well as from other sources of supply, including from the Beltran Leyva Organization (the "BLO"). The Flores brothers knew that the cocaine they obtained on credit from Sinaloa Cartel members and associates had been imported and transported from Central and South American into Mexico, and

3

eventually into the United States, by various cartel members, including Chapo and El Mayo.

At the direction of the Flores brothers', workers (the "Flores Crew") took receipt of tons of cocaine, usually in shipments of hundreds of kilograms at a time, as well as multi-kilogram quantities of heroin, in Chicago and elsewhere. At times while running their drug trafficking operation, the Flores Crew obtained and distributed approximately 1,500 to 2,000 kilograms of cocaine per month. Some of these shipments were received in the Chicago area, while others were received in the Los Angeles area, where they were then loaded into trucks and transported by Flores Crew workers to the Chicago area.

At Flores brothers' direction, their workers used several warehouses in the Chicago area to receive and store the drugs they obtained from the Sinaloa Cartel and BLO. While running their drug trafficking operation, the Flores brothers directed a member of their Crew to purchase a number of firearms, including 9mm handguns, a .45-caliber handgun, a .357-caliber handgun and a .38-caliber revolver. The Flores brothers then directed the firearms to be distributed to customers of the Flores Crew. The purchased firearms were stored at one of the Flores brothers' stash houses in the Chicago area. The Flores brothers also directed a worker to purchase an AK-47 assault rifle, which was stored at one of their stash houses in the Chicago area.

After receiving the drugs and storing them in warehouses they controlled, the Flores brothers sold the drugs to wholesale customers in the Chicago area, as well as in Detroit, Cincinnati, Philadelphia, Washington, D.C., New York, Vancouver,

Columbus, and elsewhere. Wholesale customers in these areas further distributed the cocaine and heroin to other areas, including Milwaukee.

Once their drugs had been sold, the Flores brothers directed their crew members to collect cash payments for the drugs from their customers. After the drug proceeds were collected, they were taken to various storage locations used by the Flores brothers and their associates, where the proceeds were counted and packaged for shipment to Mexico. The proceeds were then delivered to couriers and money launderers associated with the Flores brothers, who laundered the proceeds back to Mexico, where the Flores brothers and their sources of supply would receive them. This laundering of drug proceeds was largely accomplished through bulk cash smuggling across the U.S.-Mexico border. In total, while they ran their drug trafficking operation, the Flores brothers caused approximately $1,823,415,000 in drug proceeds to be laundered from the United States to Mexico, money that was paid to cartel leaders and acquired by the Flores brothers as profits.

Thus, in summary, defendant participated in a massive drug trafficking operation responsible for bringing many tons of cocaine and multiple kilograms of heroin into the Chicago area and multiple other locations throughout the United States. Those drugs undoubtedly had a devastating impact on an incalculable number of people, including by driving drug-fueled violence within Chicago. While defendant admitted to his conduct during his guilty plea, and as discussed below, provided extensive cooperation to the government over the course of many years, defendant's conduct was nonetheless extremely serious and warranted a significant sentence.

5

**Defendant's Cooperation**

In approximately November 2008, defendant and his brother decided to dissolve their criminal enterprise and cooperate with the government. Shortly thereafter, the Flores brothers proactively cooperated until their self-surrender on November 30, 2008. During their proactive cooperation, defendants recorded dozens of conversations with cartel members and leaders, including Chapo Guzman and his son and lieutenant, Guzman Salazar, and facilitated the seizure of large quantities of drugs and money in the United States. In addition, once in custody in the United States, defendant and his brother coordinated with the government to dismantle their own drug operation.

Following the Flores brothers' proactive cooperation, defendant continued to provide assistance to the government, in the Northern District of Illinois and other U.S. Attorney's Offices throughout the United States, including by signing multiple declarations in support of extraditions, and providing additional information to the government.

**Procedural History**

### The Charges Against Defendant

Defendant and his brother surrendered themselves to the custody of the U.S. Marshals Service on or about November 30, 2008, and defendant has been incarcerated since that time. The Flores brothers were subsequently charged in the First, Second, and Third Superseding Indictments in this matter with conspiracy to possess with intent to distribute and to distribute controlled substances in violation

6

of Title 21, United States Code, Section 846 (Count One), and conspiracy to import a controlled substance into the United States, in violation of Title 21, United States Code, Section 963 (Count Two). R. 7, 75, and 157. In August 2012, defendant pled guilty to Count One of the Third Superseding Indictment, pursuant to a plea agreement. R. 348 and 350.

On January 27, 2015, defendant was sentenced to serve 14 years' imprisonment, to be followed by 5 years of supervised release. R. 389. The defendant did not appeal his sentence.

Defendant is currently serving his sentence in an institution within the Bureau of Prisons (BOP), the location of which remains undisclosed in order to protect defendant's safety. He is currently scheduled to be released from custody on November 5, 2020.

### The BOP's Response to COVID-19

As reported on the BOP's website, in January 2020, the BOP began a course of action to respond to the spread of COVID-19.[1] Phase One of this course of action included the creation of an agency task force working in conjunction with subject matter experts from the Center for Disease Control and Prevention ("CDC") and the World Health Organization to review guidance about best practices to mitigate transmission. *Id.* On March 13, 2020, as part of Phase Two of the course of action, the BOP began implementing various measures to mitigate the spread of the virus.

---

[1]Federal Bureau of Prisons COVID-19 Action Plan, March 13, 2020, https://www.bop.gov/resources/news/20200313_covid-19.jsp (last visited on May 11, 2020).

These measures included suspending social visits, in-person legal visits, all inmate movement, and staff travel. The BOP also began implementing procedures to quarantine and screen inmates and staff for the virus, which included screening all newly arriving inmates for exposure risk factors and symptoms, quarantining asymptomatic inmates with exposure risk factors, and isolating and testing symptomatic inmates with exposure risk factors. *Id.*

Subsequent phases of the BOP's response included the authorization of inmate movement in order to avoid overcrowding at BOP facilities. However, such movements were limited to inmates who had been in custody for more than fourteen days and who had been subjected to exit screening to ensure that the prisoner had no COVID-19 symptoms (fever, cough, shortness of breath) and a temperature less than 100.4 F.[2] Subsequent phases of the course of action included the quarantine and isolation of all new inmates with asymptomatic inmates being quarantined for fourteen days and symptomatic inmates being isolated until testing negative for COVID-19, modifying operations to maximize social distancing, the maximization of telework for staff members, and conducting inventory reviews of all cleaning and medical supplies to ensure ample supplies were on hand and ready to be distributed as necessary at BOP facilities.[3]

---

[2] Updates to BOP COVID-19 Action Plan, March 19, 2020, https://www.bop.gov/resources/news/20200319_covid19_update.jsp%20 (last visited May 11, 2020).

[3] Bureau of Prisons Update on COVID-19, March 24, 2020, https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf (last visited on May 8, 2020); COVID-19 Action Plan: Phase Five, March 31 2020,

On April 1, 2020, as part of Phase 5 of its COVID-19 action plan, the BOP secured all inmates to their assigned cells or quarters to decrease the spread of the virus.[4] On April 13, 2020, BOP extended the implementation of Phase 5 of its COVID-19 plan until May 18, 2020.[5] Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

## ARGUMENT

On May 13, 2020, defendant filed a Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Specifically, defendant requests that his term of incarceration be reduced to time served, or in the alternative, that he be permitted to serve the remainder of his prison sentence in home confinement with his family. Defendant asserts that such relief is warranted because ████████████████ ████████, increasing his risk of serious illness from COVID-19. As discussed below, defendant's motion should be denied.

---

https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last visited May 11, 2020).

[4] COVID-19 Action Plan: Phase Five, March 31, 2020, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last visited May 11, 2020).

[5] Bureau of Prisons COIF-19 Action Plan: Phase Six, April 14, 2020, https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf (last visited May 11, 2020).

## I.   Defendant Has Not Satisfied the Legal Requirements for Relief Under 18 U.S.C. § 3582(c)(2).

### A.   Legal Standard

As amended by Section 603(b) of the First Step Act of 2018, Pub. L. 115-391,

Title 18, United States Code, Section 3582(c)(1)(A) provides:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i)   extraordinary and compelling reasons warrant such a reduction; or
>
> (ii)   the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Direct of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g); and
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

*Id.*

Under this statute, a sentence reduction must be consistent with applicable policy statements issued by the U.S. Sentencing Commission. § 3582(c)(1)(A). In addition to finding "extraordinary and compelling" reasons for the reduction, the Court must also find that "[t]he defendant is not a danger to the safety of any other

person or to the community, as provided in 18 U.S.C. § 3142(g)" per U.S.S.G. § 1B1.13(2). Finally, the Court must consider the 18 U.S.C. § 3553 sentencing factors to the extent relevant. *Id.*

Congress directed that the Sentencing Commission issue policy statements defining the "extraordinary and compelling reasons" that might warrant a sentence reduction under § 3582(c)(1)(A)(i). *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.").

Pursuant to this directive, § 1B1.13 of the Sentencing Guidelines Manual sets forth the Commission's policy statement relating to § 3582(c). Guideline § 1B1.13 provides that under § 3582(c)(1)(A), a court may reduce a term of imprisonment, after considering the § 3553(a) factors, if three criteria are satisfied: (1) "extraordinary and compelling reasons warrant the reduction;" (2) "the defendant is not a danger to the safety of any other person or to the community;" and (3) "the reduction is consistent with this policy statement." Application Note 1 to Guideline § 1B1.13 identifies factors that may constitute "extraordinary and compelling reasons" for a sentence reduction, including a defendant's medical condition, age, family circumstances, and an open-ended category for "other reasons."

Thus, in order to obtain relief under § 3582(c)(1)(A)(i), the defendant must show that:

(1) he has requested relief from the BOP and exhausted any administrative appeals in that process;

(2) there exist extraordinary and compelling reasons that warrant a sentence reduction;

(3) the requested reduction is consistent with the policy statements issued by the sentencing commission in Guideline §1B1.13, including the requirement that "the defendant is not a danger to the safety of any other person or to the community;" and

(4) the reduction is warranted in light of the factors listed in 18 U.S.C. § 3553.

## B. Flores has not complied with § 3582(c)(1)'s requirement that he exhaust his administrative remedies.

### 1. The Administrative Process

As noted above, § 3582(c)(1)(A) provides that "the court, . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . .." Under this provision, only after defendant has fully exhausted all administrative rights to appeal a General Counsel's denial of inmate's request—or 30 days have elapsed since the warden received the inmate's initial request—has the inmate exhausted his or her administrative rights, rendering the inmate eligible for relief from this Court.

12

Here, defendant filed a request for compassionate release with the warden of the institution in which he is being housed on April 22, 2020. But as defendant acknowledges, and the government has confirmed, defendant has not exhausted all the administrative appellate rights available to him, as required by 18 U.S.C. § 3582(c)(1), and 30 days have not elapsed since the warden's receipt of defendant's request.

Defendant argues, instead, that the Court has the authority to grant a sentence reduction despite his failure to exhaust his administrative remedies. He is incorrect. Contrary to defendant's suggestion, § 3582(c)(1)'s exhaustion requirement is mandatory and cannot be waived by the Court. The requirement serves the important function of permitting the initial review of the defendant's request to be conducted by BOP officials, who are in the best position to assess the propriety and feasibility of his release.

The BOP has established an orderly process for review of requests for reductions of sentence and compassionate release:

> A request for a motion under 18 U.S.C. 4205(g) or 3582(c)(1)(A) shall be submitted to the Warden. Ordinarily, the request shall be in writing, and submitted by the inmate. An inmate may initiate a request for consideration under 18 U.S.C. 4205(g) or 3582(c)(1)(A) only when there are particularly extraordinary or compelling circumstances which could not reasonably have been foreseen by the court at the time of sentencing. The inmate's request shall at a minimum contain the following information:
>
> (1)   The extraordinary or compelling circumstances that the inmate believes warrant consideration.

    (2)    Proposed release plans, including where the inmate will reside, how the inmate will support himself/herself, and, if the basis for the request involves the inmate's health, information on where the inmate will receive medical treatment, and how the inmate will pay for such treatment.

28 C.F.R. § 571.61(a). BOP "processes a request made by another person on behalf of an inmate [for example, defendant's counsel] in the same manner as an inmate's request." *Id*. § 571.61(b).

BOP's regulations also establish procedures for the consideration and administrative review of compassionate release requests involving the warden, general counsel and the Director of the BOP. *Id*. § 571.62(a). If a request for compassionate release is denied at any level of BOP's internal review process, the inmate is entitled to "written notice and a statement of reasons for the denial." *Id*. at § 571.63. "When an inmate's request is denied by the Warden [t]he inmate may appeal the denial through the Administrative Remedy Procedure (28 CFR part 542, subpart B)." *Id*.

Consistent with the statutory exhaustion requirement, BOP's program statement on compassionate release requests states that "an inmate may file a request for a reduction in sentence with the sentencing court after receiving a BP-11 response [from the Warden] under subparagraph (a), the denial from the General Counsel under subparagraph (d), or the lapse of 30 days from the receipt of such a request by the Warden of the inmate's facility, whichever is earlier." *See* BOP Program Statement No. 5050.50 (rev. Jan. 17, 2019), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf (last visited Apr. 10, 2020).

14

BOP's regulations make clear that "[i]n the event the basis of the request is the medical condition of the inmate, staff shall expedite the request at all levels." *Id.* at § 571.62(c).

BOP's receipt and consideration of compassionate release requests occurs against the backdrop of an annual reporting requirement to Congress. 18 U.S.C. § 3582(d)(3). By requiring BOP to submit annual reports about its handling of compassionate release requests, Congress clearly understood the importance of requiring inmates to submit requests through established BOP channels.

## 2. Exhaustion of Administrative Remedies is Mandatory.

When Congress enacted Section 603 of the First Step Act, it included an exhaustion requirement to ensure that BOP officials would have the first opportunity to review and consider a defendant's request for a sentence reduction or compassionate release. The requirement is mandatory.

In *United States v. Taylor*, 778 F.3d 667 (7th Cir. 2015), the Seventh Circuit held that § 3582(c)(2)'s criteria are not jurisdictional, but nevertheless mandatory. 778 F.3d at 670 (noting circuit split on whether statutory criteria for relief under § 3582(c) are jurisdictional). As *Taylor* made clear, the fact that requirements of § 3582(c) are not jurisdictional does not mean they are not mandatory. See *id.* at 670. The statutory criteria for seeking a sentence reduction under § 3582(c) "may be

mandatory and even strict" even though they do not rise to the level of being jurisdictional requirements. *Id.*[6]

Since *Taylor*, the Seventh Circuit has consistently affirmed the denial of sentence reduction motions under § 3582(c)(2) on the ground that, where the defendant failed to meet the statutorily specified criteria, the district court lacked authority to grant relief. *See, e.g.*, *United States v. Jehan*, 876 F.3d 891, 895 (7th Cir. 2017) (affirming district court's denial of motion under § 3582(c)(2) on the ground that it lacked authority to reduce sentence because one of the statutory criteria—that defendant was "sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission"—had not been met); *see also United States v. Claiborne*, No. 17-1763, 2017 WL 4621217, at *1 (7th Cir. Sept. 28, 2017) (same); *United States v. Howard*, No. 17-1947, 2017 WL 9485590, at *2 (7th Cir. Sept. 28, 2017) (same); *United States v. Koglin*, 822 F.3d 984, 986 (7th Cir. 2016) (same); *United States v. Jackson*, 637 F. App'x 223, 224 (7th Cir. 2016)

---

[6] The government assumes here for purposes of argument that the Seventh Circuit would hold, consistent with *Taylor*, that §3582(c)(1)'s exhaustion requirement is a mandatory, non-jurisdictional rule. The government maintains for the purpose of preserving the issue for possible further review that §3582(c)(1)'s criteria, including its exhaustion requirement, are jurisdictional, as most other circuit courts have held in the context of § 3582(c)(2). *See, e.g., United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010); *United States v. Williams*, 607 F.3d 1123, 1125-26 (6th Cir. 2010); *United States v. Auman*, 8 F.3d 1268, 1271 (8th Cir. 1993), *overruled on other grounds by United States v. Davis*, 825 F.3d 1014 (9th Cir. 2016); *United States v. Austin*, 676 F.3d 924, 930 (9th Cir. 2012); *United States v. Graham*, 704 F.3d 1275, 1279 (10th Cir. 2013); *United States v. Mills*, 613 F.3d 1070, 1078 (11th Cir. 2010); *see also United States v. Higgs*, 504 F.3d 456 (3d Cir. 2007) (canvassing history of judicial treatment of Rule 35 as jurisdictional and holding that Rule 35(a) and Section 3582(c)(1)(B) remains jurisdictional after *Bowles v. Russell*, 551 U.S. 205, 212-13 (2007)).

16

(same); *United States v. McCarroll*, 811 F.3d 975, 977-78 (7th Cir. 2016) (same); *see also United States v. Taylor*, 627 F.3d 674, 676 (7th Cir. 2010) (same).

This long line of cases establishes that when a defendant fails to meet the statutory criteria in § 3582(c) for seeking a sentence reduction—such as the defendant's failure to comply with the statutory exhaustion requirement—courts lack authority to grant relief. Courts have applied this same principle in denying motions for release based on COVID-19 when defendants have not complied with the statutory exhaustion requirement. *See United States v. Raia*, No. 20-1033, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020) (describing defendant's failure to comply with statutory exhaustion requirement as "a glaring roadblock foreclosing compassionate release at this point" and stressing that BOP's "extensive and professional efforts to curtail [COVID-19's] spread" underscore the importance of "strict compliance with § 3582(c)(1)(A)'s exhaustion requirement"). Because defendant has not complied with § 3582(c)(1)'s statutory exhaustion requirements, this Court cannot grant him relief.

### 3. The Statutory Exhaustion Requirement May Not Be Waived by the Court.

Contrary to defendant's contention, the statutory exhaustion requirement for compassionate release motions cannot be waived by courts. *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) ("[w]here Congress specifically mandates, exhaustion is required"); *Ross v. Blake*, 136 S. Ct. 1850, 1855 (2016) (rejecting as "freewheeling" lower court's creation of "special circumstances" exception to statutory exhaustion requirement and permitting only the exception expressly defined by statute).

17

In *McCarthy v. Madigan*, the Supreme Court addressed a district court's dismissal for failure to exhaust administrative remedies a prisoner's *Bivens* action seeking money damages for denial of medical care. 503 U.S. 140. The Court held that the prisoner was not required to exhaust administrative remedies provided by the BOP's grievance procedure prior to seeking judicial relief. In so doing, the Court was careful to distinguish between the judicial doctrine being advanced in the case before it and other settings in which Congress had specifically mandated exhaustion:

> The doctrine of exhaustion of administrative remedies is one among related doctrines—including abstention, finality, and ripeness—that govern the timing of federal-court decisionmaking. Of "paramount importance" to any exhaustion inquiry is congressional intent. *Patsy v. Board of Regents of Florida*, 457 U.S. 496, 501, 102 S.Ct. 2557, 2560, 73 L.Ed.2d 172 (1982). Where Congress specifically mandates, exhaustion is required. *Coit Independence Joint Venture v. FSLIC*, 489 U.S. 561, 579, 109 S.Ct. 1361, 1371, 103 L.Ed.2d 602 (1989); Patsy, 457 U.S., at 502, n. 4, 102 S.Ct., at 2560, n. 4. But where Congress has not clearly required exhaustion, sound judicial discretion governs. *McGee v. United States*, 402 U.S. 479, 483, n. 6, 91 S.Ct. 1565, n. 6, 29 L.Ed.2d 47 (1971). See also *Patsy*, 457 U.S., at 518, 102 S.Ct., at 2568 (WHITE, J., concurring in part) ("[E]xhaustion is 'a rule of judicial administration,' ... and unless Congress directs otherwise, rightfully subject to crafting by judges"). Nevertheless, even in this field of judicial discretion, appropriate deference to Congress' power to prescribe the basic procedural scheme under which a claim may be heard in a federal court requires fashioning of exhaustion principles in a manner consistent with congressional intent and any applicable statutory scheme. *Id.*, at 501–502, and n. 4, 102 S.Ct., at 2560, and n. 4.

*Id.* at 144. The Court went on to discuss circumstances in which judicial discretion has been exercised to excuse administrative exhaustion where Congress has not explicitly mandated it. *Id.* at 145-46. In this context, the Court described three broad sets of circumstances for courts to consider when deciding whether to require

administrative exhaustion. *Id.* at 146-47. This discussion did not, however, call into question the Court's unequivocal statement: "Where Congress specifically mandates, exhaustion is required." *Id.* at 144.

In *Gonzalez v. O'Connell*, 355 F.3d 1010 (7th Cir. 2004), the Seventh Circuit explained that the judicial discretion described in *McCarthy* applies *only* where Congress has not clearly required exhaustion, and that it is only the judicial exhaustion doctrine that is not absolute:

> "[W]here Congress has not clearly required exhaustion, sound judicial discretion governs." *McCarthy v. Madigan,* 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992). In exercising that discretion, we must balance the individual and institutional interests involved, taking into account "the nature of the claim presented and the characteristics of the particular administrative procedure provided." *Id.* at 146, 112 S.Ct. 1081. We start with "the general rule that parties exhaust prescribed administrative remedies before seeking relief from the federal courts." *Id.* at 144-45, 112 S.Ct. 1081; *see also Sanchez v. Miller,* 792 F.2d 694, 697 (7th Cir.1986) (accord). This rule, however, is not absolute.

*Id.* at 1016; *see id.* at n.5 ("*McCarthy*'s principle that when exhaustion is not statutorily mandated, 'sound judicial discretion governs,' . . . remains good law, as does its further admonitions on how that discretion should be utilized.") (citation omitted).

Other circuits agree that, where Congress has mandated exhaustion, exhaustion is required. *See, e.g., Anversa v. Partners Healthcare System, Inc.*, 835 F.3d 167 (1st Cir. 2016) ("Where, as here, Congress has not mandated exhaustion, federal courts have some leeway to relax this requirement."); *Karam v. U.S. Citizenship & Immigration Servs.*, 373 F. App'x 956, 958 (11th Cir. 2010) (""[a]lthough judicially developed exhaustion requirements might be waived for discretionary

reasons by courts, statutorily created exhaustion requirements bind the parties and the courts.'") (citation omitted); *Hettinga v. United States*, 560 F.3d 498, 502–03 (D.C. Cir. 2009) ("Parties have long been required to exhaust administrative remedies before seeking relief from federal courts, [. . .] 'Where Congress specifically mandates, exhaustion is required. But where Congress has not clearly required exhaustion, sound judicial discretion governs.'"); *Zephyr Aviation, L.L.C. v. Dailey*, 247 F.3d 565, 570 (5th Cir. 2001) ("'Where Congress specifically mandates, exhaustion is required. But where Congress has not clearly required exhaustion, sound judicial discretion governs.'") (citation omitted); *Kurfees v. I.N.S.,* 275 F.3d 332, 336 (4th Cir. 2001) ("Moreover, where Congress has explicitly mandated exhaustion [of administrative remedies], as it has in INA § 106(c), the Supreme Court has held that the requirement must be enforced."); *Lavista v. Beeler*, 195 F.3d 254, 256 (6th Cir. 1999) ("*McCarthy* recognized that when Congress specifically mandates exhaustion, it is required and the courts may not excuse the requirement."); *United States v. Dico, Inc.,* 136 F.3d 572, 575–76 (8th Cir. 1998) ("[Administrative] exhaustion 'is required where Congress imposes an exhaustion requirement by statute.'") (citation omitted); *Wang v. Reno*, 81 F.3d 808, 814 (9th Cir. 1996) ("[W]here Congress has not specifically mandated exhaustion, we conclude that consistent with congressional intent and the INA, the district court properly exercised jurisdiction over Wang's due process claim even though he had not exhausted administrative remedies with respect to his excludability."); *Bailey v. United States*, 992 F.2d 1222 (10th Cir. 1993) ("Exhaustion of administrative remedies is a statutory prerequisite to recover monetary damages

20

under the FTCA. [. . .] 'Where Congress specifically mandates, exhaustion is required.'"). *See also Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000), which stated:

> Before § 1997e(a) was amended, it did not require exhaustion, but rather, vested power in the federal courts to make such determinations. Therefore, the "sound discretion" of courts governed, [. . .] and courts were free to recognize a futility exception. Section 1997e(a), as amended, however, eliminates such discretion. It "specifically mandates" that inmate-plaintiffs exhaust their available administrative remedies, [. . .] Accordingly, as Congress has now "clearly required" exhaustion in § 1997e(a), [. . .] "it is beyond the power of this court—or any other—to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis."

In *Ross v. Blake*, 136 S. Ct. 1850 (2016), the Supreme Court considered whether a prisoner bringing a § 1983 action against correctional officers was required to exhaust his administrative remedies. The Court held that a court may not excuse an inmate's failure to exhaust administrative remedies prior to bringing suit under the Prison Litigation Reform Act, even to take "special circumstances" into account. *Id.* at 1855. The Court stated:

> The Prison Litigation Reform Act of 1995 (PLRA) mandates that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. 42 U.S.C. § 1997e(a). The court below adopted an unwritten "special circumstances" exception to that provision, permitting some prisoners to pursue litigation even when they have failed to exhaust available administrative remedies. Today, we reject that freewheeling approach to exhaustion as inconsistent with the PLRA.

*Id.* at 1854–55. The Court remanded the case solely for the district court to consider whether the statutory exception to exhaustion provided in the PLRA applied. *Id.* at 1855.

The PLRA states: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in

any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Similarly, as amended by Section 603(b) of the First Step Act, Title 18, United States Code, Section 3582(c)(1)(A) provides: "[T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . ."

The Seventh Circuit has applied *Ross* in affirming district courts' dismissals of claims for failure to exhaust administrative remedies under the PLRA. *See, e.g., Tonn v. Meisner*, 669 F. App'x 800, 801 (7th Cir. 2016); *Morrow v. Hood*, 653 F. App'x 469, 470 (7th Cir. 2016). Moreover, courts have applied *Ross* outside the context of the PLRA. For example, the Sixth Circuit in the context of a claim for benefits under the Black Lung Benefits Act stated:

> We lastly ask whether any exception to the exhaustion mandate saves the constitutional claims. When it comes to exceptions, a sharp divide separates statutory from prudential exhaustion. For exhaustion rules that originate with a clear *statutory command*, courts have "refus[ed] to add unwritten" exceptions on top of those in the text itself. *Ross*, 136 S. Ct. at 1857. For exhaustion rules that originate with *judicial prudence*, courts have felt free to adopt "judge-made exceptions" in the same prudential fashion. *Id.* In that setting, courts have developed several standard exceptions, including a "futility" exception for parties who assert claims that an agency cannot consider, *see McCarthy*, 503 U.S. at 147–49, 112 S.Ct. 1081, and a "hardship" exception for parties who face undue harm from agency exhaustion, *see McKart*, 395 U.S. at 197, 89 S.Ct. 1657.

*Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019), *reh'g denied* (Sept. 24, 2019); *see also Free v. Peikar*, 778 F. App'x 491, 492 (9th Cir. 2019) (dismissing *Bivens* action.)

Consistent with this precedent, since the COVID-19 outbreak, no court of appeals has found § 3582(c)(1)'s exhaustion requirements to be waivable, and the vast majority of district courts to address the issue have found that courts may not waive the requirement. *See United States v. Castaldi*, No. 09 CR 59 (ND. Il. Apr. 17, 2020); *United States v. Allegra*, No. 15 CR 243, (N.D. Il. Apr. 13, 2020); *United States v. Manning*, No. 15 CR 50007 (N.D. Il. Apr. 7, 2020); *United States v. Carter*, No. 18 CR 86-JMS-DML, 2020 WL 1808288, at *1 (S.D. Ind. Apr. 9, 2020); *United States v. Fevold*, No. 19 CR 150, 2020 WL 1703846, at *1 (E.D. Wis. Apr. 8, 2020) (denying compassionate release to FCI-Elkton prisoner because he failed to exhaust administrative remedies); *United States v. Albertson*, No. 16 CR 250-TWP-MJD, 2020 WL 1815853 (S.D. Ind. Apr. 8, 2020); *United States v. Brown*, No. 17 CR 111, 2020 WL 1703859 (E.D. Wis. Apr. 8, 2020); *United States v. Moskop*, No. 11 CR 30077, 2020 WL 1862636 (S.D. Il. Apr. 14, 2020).

Defendant argues that § 3582(c)(1) contains "equitable and textual exceptions" that apply to this case. In essence, defendant claims that because under Seventh Circuit precedent the procedural requirements in the compassionate release statute are not jurisdictional, they are subject to equitable exceptions such as futility. As an initial matter, Seventh Circuit precedent holding that § 3582(c)'s statutory requirements are not jurisdictional means that district courts have the "power to

adjudicate—a § 3582(c)(2) motion even when authority to grant a motion is absent because the statutory criteria are not met." *Taylor*, 778 F.3d at 670 (noting circuit split on whether statutory criteria for relief under § 3582(c) are jurisdictional). It does not mean that the statutory criteria are not mandatory. *See id*. As courts repeatedly have held, the courts may not waive or excuse a defendant's failure to satisfy § 3582(c)(1)'s exhaustion requirement.

Moreover, even if § 3582(c)(1)'s exhaustion requirement could be waived, waiver would not be warranted here. There is no basis to find that directing defendant to fully exhaust administrative remedies within BOP would be futile because the relevant decision-makers are biased or have already rejected the relief he seeks. To the contrary, on March 26, 2020, the Attorney General issued a memo directing BOP to "prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic." (Available at https://www.bop.gov/resources/news/pdfs/20200405_covid-19_home_confinement.pdf). On April 3, 2020, the Attorney General issued another memo to BOP stating, in part,

> [T]he CARES Act now authorizes me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons. I hereby make that finding and direct that, as detailed below, you give priority in implementing these new standards to the most vulnerable inmates at the most affected facilities[.]

(Available at https://www.justice.gov/file/1266661/download).

Consistent with those directives, BOP reports that it is in the process of "immediately reviewing all inmates who have COVID-19 risk factors, as described by

the CDC…to determine which inmates are suitable for home confinement." *See* https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp (last visited Apr. 15, 2020). BOP stresses:

> **Inmates do not need to apply to be considered for home confinement**. Case management staff are urgently reviewing all inmates to determine which ones meet the criteria established by the Attorney General. The Department has also increased resources to review and make appropriate determinations as soon as possible.
>
> While all inmates are being reviewed for suitability, any inmate who believes they are eligible may request to be referred to Home Confinement and provide a release plan to their Case Manager. The BOP may contact family members to gather needed information when making decisions concerning Home Confinement placement

*Id.* (emphasis in original). Together with its consideration of all inmates—and in particular the most vulnerable—for home confinement, the BOP is promptly considering requests for compassionate release.

In light of the Attorney General's directives to BOP and BOP's corresponding actions, this is not a time when defendant's pursuit of administrative remedies within BOP could be deemed futile from an *ex ante* perspective, or otherwise provide a basis for waiving § 3582(c)(1)(A)'s exhaustion requirement. Indeed, here BOP responded to defendant's request for release within five days, and to date defendant has failed to appeal that decision.[7] Nor is this a case where exhaustion should be excused because BOP's administrative process is incapable of granting defendant the relief he seeks.

---

[7] In his motion, defendant states that he was unable to file an administrative appeal due to his recent hospitalization for a tooth abscess. However, since May 13, 2020, defendant was returned to his institution and, as of the date of this filing, has yet to file an appeal of the Warden's denial of his request for compassionate release.

The Attorney General's memos make clear that BOP has an array of options, including but not limited to bringing a motion for compassionate release, that it can use to provide defendant with the relief he seeks and obviate the need for further litigation before this Court.

In sum, there is no basis for excusing the statutory exhaustion requirement, even were that permitted by the statute. Pursuant to the statutory framework that Congress has devised, BOP must be given the opportunity to make a decision concerning defendant's request.

### C. Flores Has Not Established that Extraordinary and Compelling Reasons Warrant His Release.

Defendant is also ineligible for relief because he has not established "extraordinary and compelling reasons" for release, as required under § 3582(c)(1)(A)(i). As pertinent here, defendant is not at least 70 years old (he is 38) and has not served at least 30 years in prison; thus, he is ineligible to seek compassionate release under § 3582(c)(1)(A)(ii). Instead, if defendant is eligible to seek release, it must be on the grounds that, "after considering the factors set forth in section 3553(a) … extraordinary and compelling reasons warrant such a reduction … and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

Guideline § 1B1.13, the policy statement that describes bases that might warrant a sentence reduction under § 3582(c)(1)(A)(i), provides that a court may reduce a term of imprisonment, after considering the factors set forth in 18 U.S.C. § 3553(a), if three criteria are satisfied: (1) "extraordinary and compelling reasons

warrant the reduction," (2) "the defendant is not a danger to the safety of any other person or to the community," and (3) "the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13. *See also, e.g.*, *United States v. Willis*, 382 F. Supp. 3d 1185, 1187 (D.N.M. 2019); *United States v. Brown*, 411 F. Supp. 3d 446, 448 (S.D. Iowa 2019). Application Note 1 to Guideline § 1B1.13 identifies factors that may constitute "extraordinary and compelling reasons" for a sentence reduction, including a defendant's medical condition, age, family circumstances, and an open-ended category for "other reasons." Specifically, according to the policy statements, the Sentencing Commission concluded that "extraordinary and compelling reasons" were limited to the following four scenarios:

1. The defendant suffered from a "terminal illness" or his physical or mental condition "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt. n.1(A).

2. The defendant was at least 65 years old, experiencing a serious deterioration in physical or mental health because of the aging process, and served the lesser of 10 years or 75% of his sentence. *Id.* § 1B1.13 cmt. n.1(B).

3. The defendant's family circumstances include either the death or incapacitation of the caregiver of the defendant's minor child or minor children or the incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner. *Id.* § 1B1.13 cmt. n.1(C).

4. If there were "an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.* § 1B1.13 cmt. n.1(D).

The changes to 18 U.S.C. § 3582(C)(1)(A) made by the First Step Act altered the procedure through which compassionate release could be sought, that is, by

27

allowing defendants to bring their requests to court after exhausting their administrative remedies, but they did not alter the grounds for granting relief.

Defendant argues that the fact that he suffers from a health condition that puts him at increased risk of serious illness should he contract the virus constitutes "extraordinary and compelling reasons" warranting his release. Defendant refers to the specific health condition upon which he relies in various ways, including ████ ████████████████████████████████████████████████████████████████ ████████████████████████████ But at no point does defendant explain what ████████████ he actually purportedly suffers from, nor has defendant presented any medical records from prior to his incarceration reflecting this ████████ condition. Moreover, contrary to defendant's assertion in his motion, no reference was made to defendant suffering from ████████████████████████ in the presentence investigation report ("PSR") prepared by the Probation Office at the time of defendant's sentencing, and defendant's BOP medical records make no mention of ██████████████. Notably, ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ █████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████ As his medical records reflect, BOP medical personnel have addressed defendant's other medical concerns,

and where appropriate, sent him outside the institution for medical care. Defendant does not claim otherwise.

In addition, the BOP reports on its website the steps it has taken to reduce the risk of COVID-19 infections among inmates. For example, inmate visits have been suspended, and attorney-client visits have been suspended, but can take place at a warden's discretion. The government has been advised that, within the physical housing unit in which defendant resides, social distancing measures have been implemented. Inmates are largely confined to their cells as a result of the pandemic, and are permitted outside their cells in a structured manner for food, medical, showers, and telephone access to reduce physical contact among inmates. Inmates are not allowed to congregate in common areas of the housing unit, and have been provided with personal protective equipment (PPE) such as masks, gloves (upon request), and sanitation supplies like soap for hand washing. Moreover, all inmates who have moved outside the prison for any purpose are subject to a 14 day quarantine in the Special Housing Unit to ensure that they are COVID-virus free before returning to his regularly physical housing unit.[8] The physical housing unit in which defendant resides has reported no COVID-19 cases among inmates or staff.

While the government certainly recognizes the legitimate concerns of inmates regarding the risk of infection, that concern does not suffice, when evaluated against the Sentencing Commission's policy statement set forth at Guideline § 1B1.13, and

[8] █████████████████████████████████████████████████████████████

particularly the examples listed in Application Note 1. None of the provided examples support the notion that a generalized fear of a future illness, not even during a pandemic, constitutes an "extraordinary and compelling reason" warranting relief under § 3582(c)(1)(A)(i). Nor do any of the statutory sentencing factors set forth in 18 U.S.C. § 3553(a) provide any basis for concluding that concern about potential infection, without more, constitutes an extraordinary and compelling reason for a substantial sentence reduction or release. As Judge Bucklo noted in *United States v. Allegra*, Case No. 15 CR 243, Docket Item 232 (N.D. Ill. Apr. 13, 2020), after observing the absence of COVID-19 cases at the same institution where defendant is housed, "[g]eneral concerns about possible exposure to COVID-19 do not meet the criteria for extraordinary and compelling reasons for a reduction in sentence set forth in the Sentencing Commission's policy statement on compassionate release, U.S.S.G. § 1B1.13." (quoting *Eberhart*, 2020 WL 1450745, at *2).

Moreover, release of this defendant would not be consistent with § 3553(a)'s sentencing factors, including specifically, the history and characteristics of the defendant, the need to reflect the seriousness of the offense and the need to promote respect for the law. These consideration far outweigh the speculative and undocumented concerns raised in the defendant's motion.

With respect to the history and characteristics of the defendant and the nature and seriousness of the offense, there can be no doubt that defendant's criminal conduct was incredibly serious. Since they were teens, the Flores brothers engaged in an unbroken chain of criminal conduct that culminated in their status as massive

drug distributors for two notorious and violent drug cartels. Their success made it significantly easier and more efficient for cartels to distribute hundreds of kilograms at a time with substantially reduced risk. They operated at the highest level of the drug trafficking world, and served as a pipeline for cartels that pumped tons of drugs onto the streets of Chicago and elsewhere in the United States—drugs that unquestionably fueled violence in this city.

The seriousness of defendant's offense is also highlighted by the enormous sum of drug proceeds involved in the conspiracy. In total, the Flores brothers admitted to facilitating the transfer of approximately $1.8 billion dollars of drug proceeds from the United States to Mexico, primarily through bulk cash smuggling. Even after paying cartel sources of supply and other expenses associated with running their organization, the Flores brothers profited mightily from their drug trafficking operation.

Of course, in assessing his history and characteristics, defendant's extensive cooperation with the government must be factored in. Defendant and his brother chose to walk away voluntarily from the height of the drug trafficking world. When they did so, they began cooperating with the government proactively and then historically, once they were both incarcerated. That was done at great personal risk. Their cooperation led to charges against the leadership of the Sinaloa Cartel and the BLO, and its high-ranking members, as well as the dismantling and charging of their own crew workers and customers in the Chicago area.

That said, the Flores brothers cooperation was by no means perfect, and errors in their cooperation factor into the 3553(a) assessment. As discussed in the government's sentencing memorandum, defendants failed to report the arrival of a 276 kilogram load of cocaine they sought to profit from, resulting in the drugs' distribution onto the streets of Chicago. The Flores brothers also, during their cooperation, caused their associates to collect millions of dollars in drug proceeds from a customer in Washington, D.C. – actions they took without reporting them to the government. This money was then secretly transported back to Chicago, where it was used by the Flores brothers and their families for impermissible purposes and without informing the government, including for the purchase of high end vehicles and other wholly inappropriate expenditures. Ultimately, after the government uncovered these funds, the Flores brothers turned over approximately $4 million (minus several hundred thousand dollars provided to the Flores family for their sustenance and security and legal fees) in drug proceeds to the government. As detailed in the government's 2015 sentencing memo, after an exhaustive investigation as to whether additional funds were being hidden by the defendant and his brother from the government, the government found no evidence of the existence of additional funds, and thus represented in its sentencing memorandum that the Flores brothers were not hiding assets from the government or the Court. The

government no longer holds the view that all recoverable proceeds were turned over to the government.[9]

In January 2015, Judge Castillo imposed a 14-year sentence on defendant and his brother. That sentence took into account all of the § 3553(a) factors, including defendant's cooperation and the seriousness of his offense, and was a sentence within the range agreed to by both parties. Defendant should be required to serve out the remaining portion of that sentence in custody.

## II. The Court Lacks Authority to Order that Defendant Serve the Remainder of His Sentence in Home Confinement.

Alternatively, defendant's requests the Court to order that he be permitted to serve the remainder of his sentence in home confinement. This Court lacks authority to grant this request.

Under 18 U.S.C. § 3624(c)(1), the BOP—but not the court—has authority to place inmates in community confinement facilities during the final portion of their sentences for up to 12 months. Specifically, the statute provides:

> (1) In general.--The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility.

Section 3624(c)(2), as amended § 602 of the First Step Act, provides:

> (2) Home confinement authority.--The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months. The Bureau of

---

[9] Defense counsel was made aware of the government's change in position in early March 2020.

> Prisons shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph.

18 U.S.C.A. § 3624.

This provision in no way guarantees a prisoner a specific placement; it merely directs the Director of the BOP to consider it. Nor does it provide the courts with any authority over decisions with respect to home confinement designations—or any other designation decisions. Reservation to the BOP of determinations regarding the designation of defendants—whether to particular correctional institutions, or reentry centers, or home confinement—is reasonable given that the BOP, rather than the Court, is the best position to take into account defendant's individual circumstances, as well as systemic concerns, such as, in the present circumstances, the impact of COVID-19 on its facilities, staff, and the other inmates under its care, as well as public safety.

Neither 18 U.S.C. § 3582(c)(1) nor the recently enacted CARES Act change provide the Court with authority over the locations where a defendant is designated to serve his sentence. Section 3582(c)(1), as amended by Section 603 of the First Step Act, provided the courts with no additional authority with respect to the implementation of federal prison sentences, such as by ordering a defendant's designation to home confinement—such authority continues to rest solely with the BOP, under the direction of the Attorney General. *See United States v. Edwards*, No. 3:14-CR-30173-NJR-3, 2019 WL 5555559, at *4 (S.D. Ill. Oct. 28, 2019); *United States v. Tovar-Zamorano*, 2019 WL 2005918 at *2 (D. Kan. May 7, 2019) (First Step Act

34

"does not divest the BOP of its statutory discretion to determine the location of an inmate's imprisonment"); *Davis v. United States*, No. 17 CR 294-DRH, 2017 WL 2214874, at *2 (S.D. Ill May 19, 2017) ("Petitioner's request in his Petition that this Court make an RRC determination in place of the BOP, it will not, as it is not the role of this Court to conduct an independent review of the § 3621(b) factors and make a de novo determination as to Petitioner's placement in a halfway house."); *United States v. Garza*, No. 18-CR-1745-BAS, 2020 WL 1485782, at *1 (S.D. Cal. Mar. 27, 2020) (holding that courts lack the authority to designate home confinement, finding that the Bureau of Prisons alone has the statutory authority to choose the location where prisoners serve their sentences).

The CARES Act extends the authority of the Attorney General to lengthen the maximum amount of time for which the BOP is authorized to place a prisoner in home confinement under the first sentence of 18 U.S.C. § 3624(c)(2):

> During the covered emergency period, if the Attorney General finds that emergency conditions will materially affect the functioning of the [BOP], the Director of the [BOP] may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of [18 U.S.C. § 3624(c)(2)], as the Director deems appropriate.

134 Stat. at 516 (CARES Act § 12003(b)(2)). It does not provide any authority over home confinement to the court.

Although the Court may not order that an inmate be designated to serve his sentence of imprisonment in home confinement, it may, in addition to reducing the sentence, "impose a term of probation or supervised release, with or without conditions, that does not exceed the unserved portion of the original term of

35

imprisonment." The conditions the Court may require include home confinement. *See* 18 U.S.C. §§ 3582(c)(1), 3563(b)(19), and 3583(d). Accordingly, were the Court to determine that the defendant did satisfy the statutory criteria for a reduction in sentence, it could order that the defendant serve a period of time in home confinement upon his release. As discussed above, however, no reduction in defendant's sentence is warranted.

## CONCLUSION

For these reasons, the government respectfully requests that the Court deny the defendant's motion.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:   */s/ Erika L. Csicsila*
ERIKA L. CSICSILA
ANDREW C. ERSKINE
Assistant United States Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300